SUPERIOR COURT 
 
 COMMONWEALTH v. JOSE RODRIGUES

 
 Docket:
 21-615
 
 
 Dates:
 August 16, 2023
 
 
 Present:
 Peter B. Krupp
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM AND ORDER ON MOTION TO DISMISS
 
 

      Defendant Jose Rodrigues (“defendant”) is charged with unlawful possession of a firearm and related charges. The case is before me on defendant’s motion to dismiss based on the Commonwealth’s failure to disclose an exculpatory surveillance videotape before he entered a guilty plea. After an evidentiary hearing at which I took testimony from Boston Police Det. Brian Ball (“Det. Ball”), and after review of the docket, recordings of prior hearings, and affidavits submitted in connection with the motion, the motion is allowed.

BACKGROUND

     I make the following factual findings based on the preponderance of the evidence. 

     At about 9:30 p.m. on May 11, 2021, Boston Police Officers were responding to a ShotSpotter activation in Roxbury. Blocks away from the ShotSpotter activation, they observed a group of about 20 people in a residential parking lot between 108 Harold Street and 136 Townsend Street (“the Parking Lot”). Officers turned their unmarked vehicle into the Parking Lot and saw a parked gray Honda. Defendant was seated in the Honda, together with Khamaree Price (“Price”), and at least one other person. The police wrote in their report that there were two men seated in the Honda – defendant in the driver seat and Price in the passenger seat. The person in the back of the Honda exited first, followed by the two men in the front. After the

-1-

police observed a handgun under the driver seat and one under the passenger seat, they arrested defendant and Price at the scene, and each was charged with unlawful possession of the particular firearm under his particular seat.[1] See also Commonwealth v. Price, Case No. 2184CR00616.

     Det. Ball, by then an 18-year veteran of the Boston Police Department, responded to the scene, spoke to the officers on scene, later reviewed the police report, and knew the police reported that there were only two men in the Honda.
      
     Rodrigues and Price were initially charged in the Roxbury Division of the Boston Municipal Court. On May 13, 2021, a Superior Court ADA (“the Superior Court ADA”) was assigned to this case. A different ADA handled the case while it was in the Boston Municipal Court (“the BMC ADA”).
      
     Following his arrest, Rodrigues was detained under G.L. c. 276, § 58A. At or before the 58A hearing, the Commonwealth provided body camera recordings of the stop and arrest, but the angles of the body-worn cameras provided little evidence, and no conclusive evidence, regarding the layout of, or the overall activity at, the Parking Lot or the number of people in the Honda.
      
     Within two weeks after the incident, Det. Ball retrieved a thumb drive with a video recording from a private security camera mounted high on an adjacent building, which captured a bird’s eye view of the Parking Lot during the events in question (“the Surveillance Video”). Det. Ball watched the Surveillance Video and observed that it depicted three people in the Honda. In the Surveillance Video, an unidentified individual can be seen exiting the Honda via

--------------------------------------------

         [1] Defendant was charged with possessing the Smith and Wesson model M&P 40 shield found under the Honda’s driver seat. Price was charged with possessing the 9mm Ruger found under the Honda’s passenger seat.

-2-

its rear passenger side door and moving away from the police cruiser. The Surveillance Video suggests the real possibility that the individual who was in the back of the Honda left one or both of the firearms in the Honda before leaving the vehicle.
      
     There was nothing unusual about Det. Ball looking for and collecting private or public surveillance recordings of incidents such as this. Routinely such recordings would be turned over to the prosecuting ADA within a month of an arrest. In this instance, however, rather than turn the Surveillance Video over to one of the prosecuting ADAs, Det. Ball left the Surveillance Video in his office.[2] The Surveillance Video was not turned over to defendant at that time, nor was the existence of the Surveillance Video shared with the defense.
      
     The Superior Court ADA knew that searching for and retrieving surveillance video recordings was a standard part of an investigation of this type. Because of this practice, in mid- September 2021, the Superior Court ADA emailed Det. Ball. The subject of the email was “Additional Discovery – Comm. v. Price & Rodrigues.” In the email, the Superior Court ADA asked Det. Ball to email “a copy of the police report . . . and any associated ShotSpotter report(s).” In the same email, the Superior Court ADA asked: “Also, can you let me know whether you pulled any video on this case?” (Emphasis added). Det. Ball did not respond to this email.[3]

--------------------------------------------

         [2] Det. Ball testified that he notified other officers that he had recovered a surveillance video, but he was not sure which officers he notified and did not know if any other officers ever watched the Surveillance Video. None of the other officers, including those who testified in the grand jury and those who testified at the suppression hearing, brought the existence of the Surveillance Video to the attention of any prosecutor.

         [3] Det. Ball was certainly busy. He regularly worked 70-90 hours/week, is assigned to investigate dozens of cases at any one time, receives 40-50 emails per day, and is involved with investigations involving other agencies.

-3-

     Because he did not receive a response, on October 7, 2021, the Superior Court ADA forwarded the same email to Det. Ball, asking again for “a copy of the police report . . . and any associated ShotSpotter report(s).” The Superior Court ADA forwarded the same email to Det. Ball again on November 5, 2021, and November 15, 2021. On November 15, 2021, Det. Ball finally responded by email that he would try to find “the actual shot spotter activation,” but he did not mention the Surveillance Video. It does not appear that the Superior Court ADA followed up with Det. Ball to determine if any police officer had “pulled any video on the case.”
      
     On October 6, 2021, a Suffolk County Grand Jury returned an indictment charging Rodrigues with unlawful possession of a firearm as a subsequent offense, carrying a loaded firearm, and unlawful possession of ammunition.4 Defendant was arraigned on November 17, 2021. Again defendant was detained under G.L. c. 276, § 58A. See Findings and Order on Motion for Detention under G.L. c. 276, § 58A (Nov. 17, 2021) (Docket #8).
      
     A pretrial conference in the Superior Court cases against defendant and Price was scheduled for December 20, 2021, but was continued to February 18, 2022. At the pretrial conference on February 18, 2022, the Superior Court ADA stated:

     The majority of discovery has been provided as reflected in discovery notices 1 and 2. Outstanding discovery in my view would be the radio turret recordings from the arrest, certified copies of RMV records, and certified prior convictions as well as the full crime lab packet.

--------------------------------------------

         [4] The charges in the Roxbury Division were dismissed after Rodrigues and Price were indicted. Before the Roxbury case was dismissed, scheduled probable cause hearings were continued several times. On June 22, 2021, the Commonwealth told the Roxbury Division that it was not ready for the probable cause hearing scheduled for that date. Defendant’s motion to dismiss was denied and defendant remained in custody. On July 26, 2021, and August 27, 2021, the Commonwealth again said it was not ready on the scheduled probable cause hearing date. Continuances were granted over defendant’s objection while defendant remained in custody.

-4-

     A second pretrial conference was held on April 4, 2022. At the pretrial conference on April 4, 2022, the Superior Court ADA stated:

     A substantial amount of discovery has been provided – police reports, firearms analysis reports, latent print reports, photographs, body worn camera, grand jury minutes – everything reflected in notice of discovery 1 and 2. I think the only thing outstanding would be the full lab packets themselves and some certified copies of RMV records.

     The Superior Court ADA did not mention that he still needed to review the police detective’s file to determine if all discovery had in fact been produced.
      
     On May 17, 2022, defendant filed a motion to suppress the fruits of the stop. A hearing on the suppression motion was scheduled for July 20, 2022.
      
     In June 2022, defendant moved for release on bail because 180 days had passed after defendant was initially held by the Superior Court under § 58A. The Court (Ullmann, J.) denied the motion, but indicated that “this ruling should be revisited in November 2022 if the Commonwealth is not prepared to try the case at that time.” See Docket Entry (June 9, 2022).
      
     On July 11, 2022, more than a year after obtaining the Surveillance Video, and shortly before the scheduled suppression hearing, Det. Ball emailed the BMC ADA about the Surveillance Video. He wrote: “Checking in on this case – I have some parking lot video that you may not have received in discovery. I checked my emails on this and I don’t think we’ve met on it.” The BMC ADA forwarded Det. Ball’s email to the Superior Court ADA and reminded Det. Ball that the case had been indicted and that the Superior Court ADA was handling the case. The Superior Court ADA did not respond to Det. Ball’s email,[5] and Det. Ball apparently did not follow-up with the Superior Court ADA at that time.

--------------------------------------------

         [5] By affidavit, the Superior Court ADA indicates he was on vacation from Saturday, July 2, 2022, to Monday, July 11, 2022, he does not “recall reading this email,” and

-5-

     On July 20, 2022, the Superior Court ADA represented the Commonwealth during the suppression hearing. By the time of the suppression hearing, no prosecutor had yet met with Det. Ball, the detective handling the case, or any other police officer, to determine if all discovery had been gathered and produced, and the Surveillance Video had not been disclosed to the defense.
      
     During the suppression hearing, Boston Police Off. Christopher Stevens testified that on the night in question, he was driving in a police vehicle, with three other officers. He (Stevens) was in the front passenger seat and Off. Dennis Layden was driving. Off. Stevens testified that when his vehicle entered the Parking Lot, “we noticed that two individuals were sitting in a Silver Honda Accord.”[6] (Emphasis added). Off. Layden similarly testified that when he drove his vehicle into the Parking Lot, he observed a silver sedan facing his vehicle. The Superior Court ADA then asked: “Could you see how many people were inside that gray sedan?” Off Layden answered, “Two people.” (Emphasis added). Off. Layden testified that he recognized those two
individuals.

     In September 2022, the Court (Budreau, J.) denied the motion to suppress. Judge Budreau seemingly found based on the officers’ testimony that there were only two people inside the Honda.[7]

--------------------------------------------

believes that he “inadvertently and erroneously overlooked the portion of the email indicating that Detective Ball was in possession of the video.”

         [6] Off. Stevens reiterated this on cross-examination: “Q: You stated that you only saw two people in the car; is that correct? A: Correct. Q: Were there two people in the back seat of the car? A: No.”

         [7] In relevant part, Judge Budreau wrote: “As they [the police officers] pulled in their lights illuminated the occupants of a Honda about ten to fifteen feet away. The officers immediately recognized the two defendants in the car, one of whom, Price, was observed bending down to the floor. The two men alit from their parked car before the officers exited their vehicle.” Memorandum and Order at 1-2 (Sept. 23, 2022) (Docket #21).

-6-

     Both Rodrigues and Price were scheduled for trial beginning on November 8, 2022. A final pretrial conference was scheduled for October 31, 2022. By the time of the final pretrial conference, which was held on the scheduled date, no ADA had met with Det. Ball or any other officer to determine if all discovery had been collected and produced to the defense, and the defense had not been made aware of the existence of the Surveillance Video.
      
     On November 2, 2022, after negotiation with the Commonwealth, Rodrigues entered a guilty plea to a reduced charge of unlawful firearm possession (first offense) and to the charge of carrying a loaded firearm. The sentencing enhancements and the charge of unlawful possession of ammunition were dismissed. I imposed the parties’ agreed-to sentence of 3 years to 3 years and a day in state prison on Indictment 001 (unlawful possession of a firearm), with 18 months of probation on Indictment 002 (carrying a loaded firearm) from and after his incarceration. After sentencing, Rodrigues was transferred to the custody of the Department of Correction.[8] 

     Price decided to proceed to trial on November 8, 2022. On November 7, 2022, however, the Superior Court ADA spoke to Det. Ball by telephone and learned about the existence of the Surveillance Video. At no time prior to November 7, 2022, had the Superior Court ADA met or spoken with Det. Ball to confirm that the Commonwealth had obtained all of the relevant information in the investigators’ files. On November 8, 2022, the Superior Court ADA informed defense counsel of the existence of the Surveillance Video and explained that it was exculpatory because it showed a third person exiting the Honda.

--------------------------------------------

         [8] While this fact was not established during the hearing, I take notice of the fact that defendant was only being held on this case; a mittimus issued on November 2, 2022, committing defendant to the custody of the Department of Correction, see Docket #22; and on November 14, 2022, in order to arrange for defendant to be brought back before the court, a writ of habeas corpus had to be issued to the Souza-Baranowski Correctional Center.

-7-

     On November 21, 2022, I vacated Rodrigues’ conviction and sentence, and set bail, all without objection by the Commonwealth. As of November 21, 2022, when Rodrigues was released from custody, he had been in custody on this matter for more than a year and a half.
      
     Both Rodrigues and Price filed motions to dismiss the charges based on the late disclosure of the Surveillance Video, which raised questions about Rodrigues’ conviction and the viability of the case against Mr. Price. The Commonwealth ultimately filed a Nolle Prosequi in the case against Mr. Price. The Nolle Prosequi provided the following explanation:
   
     [O]ur . . . Office received and reviewed exculpatory video evidence post-indictment in this case. Upon further review of the case and reevaluation of the present state of the evidence with respect to Mr. Price, the Commonwealth has determined that there is no longer a reasonable expectation of proving each and every element of the offenses beyond a reasonable doubt at trial.

     Commonwealth v. Price, Case No. 2184CR00616, Nolle Prosequi (Apr. 28, 2023) (Docket #34).

DISCUSSION

     Massachusetts requires the Commonwealth to disclose mandatory discovery in criminal cases automatically and imposes a burden of inquiry on every prosecutor to comply with those obligations. The scope of mandatory discovery is broad. It includes, among other things, “[a]ny facts of an exculpatory nature,” Mass. R. Crim. P. 14(a)(1)(A)(iii); and “[m]aterial and relevant police reports, photographs, tangible objects, all intended exhibits, reports of physical examinations of any person or of scientific tests or experiments, and statements of persons the party intends to call as witnesses.” Mass. R. Crim. P. 14(a)(1)(A)(vii).
      
     The mandatory discovery rule is designed to be self-executing. No court order is required. Rule 14 has “the force and effect of a court order, and failure to provide discovery pursuant to [that rule] may result in application of any sanctions permitted for non-compliance with a court order.” Mass. R. Crim. P. 14(a)(1)©.

-8-

     The automatic discovery rules, while subject to a continuing duty, Mass. R. Crim. P. 14(a)(4), require inquiry of relevant personnel and production of automatic discovery “in the possession, custody or control of . . . persons who have participated in investigating or evaluating the case” at an early point in the case; i.e. “at or prior to the pretrial conference.” Mass. R. Crim. P. 14(a)(1)(A). A prosecutor clearly “has a duty to learn of and disclose to a defendant any exculpatory evidence that is held by agents of the prosecution team.” Commonwealth v. Diaz, 100 Mass. App. Ct. 588, 593 (2022), quoting Commonwealth v. Ware, 471 Mass. 85, 95 (2015) (internal quotations omitted). “This ‘duty to inquire’ … is essential to the performance of a prosecutor’s discovery obligations.” Diaz, 100 Mass. App. Ct. at 593, quoting Commonwealth v. Martin, 427 Mass. 816, 823 (1998) (internal citation omitted). “[I]t is incumbent on an ADA to ask a police prosecutor, or other similar official, whether all discoverable materials relating to a particular case have been given to the Commonwealth.” Commonwealth v. Frith, 458 Mass. 434, 441 (2010) (emphasis in original). “‘Reasonableness’ is the only limitation on the prosecutor’s duty of inquiry.” Diaz, 100 Mass. App. Ct. at 593, quoting Frith, 458 Mass. at 440-441. The scope of reasonable inquiry for the prosecutor is informed by requests by the defense, orders of the court, and rules of discovery. See Diaz, 100 Mass. App. Ct. at 593 (“scope of reasonable inquiry for the prosecutor . . . extended to inquiring of the detectives whether [ ] information was accessible to the government”). And, as indicated earlier, that inquiry must be promptly conducted so that production of exculpatory evidence and other mandatory discovery may be provided “at or prior to the pretrial conference,” Mass. R. Crim. P. 14(a)(1)(A); in this case, by February 18, 2022, or, at the latest, by April 4, 2022.
      
     Once the prosecution “has provided all discovery required by [Rule 14] or by court order,” it is required to file a certificate of compliance, stating “that, to the best of its knowledge

-9-

and after reasonable inquiry, the party has disclosed and made available all items subject to discovery other than reports of experts, and shall identify each item provided.” Mass. R. Crim. P. 14(a)(3). The certificate of compliance is a backstop, requiring documentation that the prosecutor has made due inquiry and complied with the mandatory discovery rules. The certificate of compliance does not modify the mandatory disclosure requirements or alter the time frame set for production of such mandatory discovery.
      
     If the prosecution fails to comply with its automatic disclosure obligations, sanctions are expressly authorized. “For failure to comply with any discovery order issued or imposed pursuant to this rule, the court may make a further order for discovery, grant a continuance, or enter such other order as it deems just under the circumstances.” Mass. R. Crim. P. 14(c)(1). While the court has “wide discretion” to fashion an appropriate sanction, Commonwealth v. Carney, 458 Mass. 418, 429 (2010), the sanction selected must be “remedial in nature,” not punitive; and “should be tailored appropriately to cure any prejudice resulting from a party’s noncompliance and to ensure a fair trial.” Commonwealth v. Carney, 458 Mass. 418, 427, 429 (2010). Before imposing a severe sanction, the court must consider “(1) the prevention of unfair surprise; (2) evidence of bad faith in violation of the discovery order; (3) prejudice to the other party caused by the admission of the late disclosed evidence; (4) the effectiveness of less severe sanctions; and (5) the materiality of the evidence to the case.” Commonwealth v. Daly, 90 Mass. App. Ct. 48, 52 (2016). See Commonwealth v. Cronk, 396 Mass. 194, 198-199 (1985) (“absent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice”).
      
     The Commonwealth argues that its conduct amounts to inadvertence or neglect, but not the kind of serious misconduct that warrants dismissal. I disagree. That Det. Ball may have been

-10-

busy when the Superior Court ADA asked about whether he had pulled video, or that the Superior Court ADA had recently returned from vacation when the BMC ADA forwarded Det. Ball’s email about a surveillance video, is not compelling. These entirely mundane, predictable circumstances neither explain, nor excuse, the 18-month failure of the assigned ADA and the investigating officers to meet or confer to determine if the ADA had all of the relevant material and information in the files of the investigating officers.
      
     This case involves both egregious misconduct and actual prejudice. In contrast to, for example, Commonwealth v. Light, 394 Mass. 112 (1985), both the ADA and the detective knew they had an obligation to turn over any surveillance videotape recovered during the investigation. Id. at 115 (“no indication that the misconduct was intentional in the sense that the police knew the defendant was entitled to the test results”). The ADA asked for any such video in 2021, but the detective failed to respond and the ADA failed to follow-up. Months later, in mid-2022, the detective brought the existence of the videotape to the attention of the ADA, but the ADA did not respond and the detective let it drop. See Commonwealth v. Redding, 382 Mass. 154, 157 (1980) (“The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State’s Attorney, were guilty of the nondisclosure.”), quoting Commonwealth v. St. Germain, 381 Mass. 256, 261 n.8 (1980). Most egregiously, and perhaps systemically problematic, the DA’s office did not ever confirm that it had all of the relevant discovery, despite its assurances to the court, and despite its obligation to produce all exculpatory information by the time of the pretrial conference.[9] Neglect, layered on neglect, layered on a process that

--------------------------------------------

         [9] See, e.g., Commonwealth v. Correia, 492 Mass. 220, 224-225 (2023) (Commonwealth failed to disclose statements by defendant in rap lyrics known to prosecutor before trial); Commonwealth v. Pope, 489 Mass. 790, 798-805 (2022) (Commonwealth failed to disclose preliminary field report and memorandum reflecting witness’ earliest statements); Commonwealth v. Caldwell, 487 Mass. 370, 375-379 (2021) (Commonwealth failed to disclose

-11-

disregards the important time requirements for production of mandatory discovery, rises to the level of egregious misconduct or at least a reckless disregard of the prosecutor’s sacred discovery obligations.
      
     On the issue of prejudice, there is no question that the presence of a third person in the back of the Honda when the police drove into the Parking Lot is highly relevant and exculpatory. First, it suggests that someone else may have possessed the firearm with which defendant is charged. Indeed, the Commonwealth has conceded as much in its Nolle Prosequi filed in Price’s case. Not only would such information have strengthened defendant’s hand at trial, it would have strengthened his hand in negotiating a plea if he chose to entertain a plea. In addition, such information would have strengthened defendant’s argument that he should have been released, either at the initial 58A hearing, or after the passage of 180 days.
      
     Second, defendant has suffered prejudice by having proceeded with a suppression hearing based on testimony by police officers whose testimony could have been impeached with the non- disclosed Surveillance Video.
      
     Third, defendant has been prejudiced by pleading guilty and serving time in state prison without knowledge of the existence of the Surveillance Video and the exculpatory information it contained. See, e.g., Commonwealth v. Cotto, 2017 WL 4124972 at * 38 (Mass. Super. June 26, 2017) (Carey, J.) (“Where the government’s delayed disclosure of exculpatory evidence occurred

--------------------------------------------

note about exculpatory information about key witness’ prior cooperation); Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 177-181 (2021) (Commonwealth failed to disclose witness’ “changed statements”); Commonwealth v. Diaz, 100 Mass. App. Ct. 588, 593-596 (2022) (Commonwealth failed to disclose cell phone call log accessible to police and requested by defendant); Commonwealth v. Harrison, 100 Mass. App. Ct. 376, 383-384 (2021) (Commonwealth failed to disclose recorded interview of important witness in police files until after witness testified at trial); Commonwealth v. McMillan, 98 Mass. App. Ct. 409, 411-416 (2020) (Commonwealth failed to disclose information concerning informant’s misconduct).

-12-

while or after defendants had served sentences of incarceration, it cannot be said that the disclosure did not cause irremediable harm or that it was sufficiently timely to allow the defendant to make effective use of the evidence in preparing and presenting his case . . . The prejudicial effect of spending more time incarcerated due to prosecutorial withholding of exculpatory evidence cannot be cured by a new trial.”). Dismissal is the appropriate sanction on the unique facts of this case.

ORDER

     Defendant’s Motion to Dismiss (Docket #35) is ALLOWED. This case is hereby

DISMISSED.

/s/Peter B. Krupp
Justice of the Superior Court

August 16, 2023